UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

_____

IN RE:
STEPHEN C. TOLI AND
CINDY L. TOLI,                                           Chapter 7
                    DEBTOR.                         Case No. 12-19194-WCH
_____

DONALD R. LASSMAN, CHAPTER 7
TRUSTEE,
                    PLAINTIFF,
                                                                 Adversary Proceeding
v.                                                                No. 13-1373

ROBERT E. ROBINSON AND
DINA M. ROBINSON,
                    DEFENDANT.
_____

## MEMORANDUM OF DECISION

## I. **INTRODUCTION**

The matter before the Court is the Complaint filed by Donald R. Lassman (the

"Trustee"), the Chapter 7 trustee of the estates of Stephen C. Toli and Cindy L. Toli (jointly, the

"Debtors"), through which he, as the assignee of rights from the United States Small Business

Administration (the "SBA"), seeks: (1) to avoid and preserve for the benefit of the estate certain

transfers made to Robert E. Robinson ("Robert") and Dina M. Robinson ("Dina," jointly with

Robert, the "Defendants") as fraudulent transfers under Massachusetts law and 11 U.S.C. § 548;

and (2) damages for common law fraud, aiding and abetting fraud, negligent misrepresentation,

and violations of Mass. Gen. Laws ch. 93A ("Chapter 93A").  I conducted a two-day trial on

May 18 and 19, 2015, at which seventeen exhibits were admitted into evidence and five

1

witnesses testified.  For the reasons set forth below, I will enter judgment in favor of the Trustee

only against Robert on Counts VI and VII for common law fraud and aiding and abetting fraud,

and against Dina on Count VII negligent misrepresentation.

## II. BACKGROUND

On September 8, 2014, the parties filed a Joint Pre-Trial Statement setting forth facts

which the parties agreed were admitted and required no proof.[1]  Thus, in large part, the salient

facts are undisputed.  The agreed facts are as follows.

### A. The Stipulated Facts

On February 23, 2006, the Debtors as buyers and Defendants as sellers executed a

purchase and sale agreement (the "P&S") for the sale of business assets and commercial real

property located in Taunton, MA (the "Property").[2]  The Property consists of a two-story

building that houses a bar on the first floor and a rooming house with seven rooms on the

second.[3]  The P&S listed the sale price of the Property as $400,000.00.[4]  Section 1.5 of the P&S,

which sets forth the purchase price expressly provides in bold face type that "[i]f any of the

Balance is to be paid by a private note from Buyer to Seller, state that amount here and attach

details of such note and the related mortgage," and is left blank.[5]  The P&S also contains an

integration clause in Section 2.13 that provides that "[a]ll offers and agreements made prior to

---

[1] Joint Pre-Trial Statement, Docket No. 46.

[2] Joint Pre-Trial Statement, Docket No. 46 at 2.  The parties stipulated that the Debtors were the buyers, but the P&S reflects that buyer is Stephen Toli or his nominee.

[3] Trans. May 19, 2015 at 57:7-14.

[4] Joint Pre-Trial Statement, Docket No. 46 at 2; Ex. 1.

[5] *Id.*

this Agreement are hereby discharged and all further obligations of the parties are contained only in this Agreement."[6]

In order to complete the sale transaction, the Debtors needed financing.  To that end,  the Debtors, through a corporation known as Steve's Backstage Pass, Inc. ("Backstage"), obtained two conventional mortgage loans from Mechanics' Co-operative Bank ("Mechanics'") totaling approximately $266,000.00, and a 20-year loan in the amount of $147,000.00 evidenced by a debenture issued by South Eastern Economic Development Corporation ("SEED") acting as the Certified Development Company, which was guaranteed by the SBA.[7]  In order to obtain the so-called SBA 504 loan, the Debtors were required to provide SEED and the SBA with a copy of all the closing documents and the executed P&S, supply accurate financial statements, and allow verification of financial information.[8]  Additionally, the Debtors were each required to execute unconditional guarantees of the loans in favor in favor of SEED.[9]

The Defendants knew that the Debtors were seeking to borrow money from the mortgage lenders to fund the sale and without it, they could not close.[10]  They further understood that the Debtors would provide the P&S to the mortgage lenders in order to obtain approval of the financing, and that the lenders would rely on the truthfulness and completeness of the terms set forth in the P&S and HUD-1, including the purchase price and amounts of any other outstanding loans, in granting that approval.[11]  Nevertheless, the Defendants had no direct interactions with

---

[6] *Id.*

[7] Ex. 2, 11-13.

[8] Ex. 11.

[9] Ex. 14.

[10] Joint Pre-Trial Statement, Docket No. 46 at 3.

[11] *Id.*

the Debtors' lenders other than signing the P&S and HUD-1 at the closing and receiving sale proceeds from the loan funding.[12]

The sale of the Property closed on September 6, 2006 (the "Closing").[13]   Stephen Toli and the Defendants each signed the U.S. Department of Housing and Urban Development Settlement Statement (the "HUD-1") at the Closing.[14]   The HUD-1 recites a contract sales price as $400,000.00.[15]   Directly above the signatures of Stephen Toli and the Defendants on the HUD-1, it states: "I carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction."[16]

Following the Closing, the Debtors and Defendants met at Dina's workplace and the Debtors executed a promissory note (the "Promissory Note") in favor of the Defendants in the amount of $100,000.00.[17]   The Promissory Note was drafted by the Defendants' attorney and notarized by an acquaintance of Dina.[18]   The Promissory Note is jointly payable to the Defendants and has a term of five years with payments of at least $1,000.00 due on the first of each month commencing October 1, 2006, with discretionary periodic balloon payments permitted at the Debtors' option.[19]   Upon a payment default, the entire balance then remaining

---

[12] Id.

[13] Id.

[14] Id.; Ex. 2.

[15] Id.

[16] Id.

[17] Joint Pre-Trial Statement, Docket No. 46 at 3; Ex. 3.

[18] Id.

[19] Id.

unpaid would be accelerated and become due and payable at the option of the Defendants.[20] Additionally, in the event of default, the Debtors would become liable for all costs of collection including attorney's fees.[21]   The Promissory Note simply states that the loan is on account of "for value received," and did not obligate the Defendants to provide any property, services or other consideration in exchange for the payment obligation.[22]

The parties agree that the $100,000.00 obligation under the Promissory Note was always intended to be part of the purchase price for the Property, meaning that despite the express terms of the P&S, the true purchase price for the Property was $500,000.00.[23]   Indeed, the Defendants concede that they would not have sold the Property to the Debtors for a purchase price of $400,000.00 as stated on the P&S and HUD-1.[24]   The Defendants wanted the additional consideration of $100,000.00 in cash, but understood the Debtors lacked the resources for such a payment.[25]   Knowing that the sale would not close if the Debtors were unable to obtain financing, the Defendants agreed to be paid the additional $100,000 through the Promissory Note "outside of the Closing."[26]   Neither the Debtors nor the Defendants ever disclosed the existence of the Promissory Note or subsequent payments made thereon to the Debtors' lenders.[27]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Joint Pre-Trial Statement, Docket No. 46 at 3.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Joint Pre-Trial Statement, Docket No. 46 at 4.

Between October 1, 2006 and May 18, 2012, the Debtors made payments to the Defendants on account of the Promissory Note in the amount of $57,700.00 (the "Transfers").[28] Based on the term of the Promissory Note, if they had only made the minimum payment of $1,000.00 per month, the remaining balance at the end of the five-year term would have been $40,000.00.[29]   The Debtors, however, stopped making regular monthly payments under the Promissory Note in May, 2008, and missed the required $1,000.00 monthly payments, or otherwise made late or partial payments over the next few years until payments stopped completely in May, 2012.[30]

On November 20, 2012, the Debtors filed a voluntary Chapter 7 petition, and the Trustee was appointed the following day.[31]   During his investigation of the Debtors' financial dealings, the Trustee discovered the existence of the Promissory Note and Transfers.[32]   On February 1, 2013, the Trustee sent a letter to the Defendants demanding repayment to the estate of all payments made by the Debtors under the Promissory Note (the "Demand Letter").[33]   On February 14, 2013, Defendants sent a response to the Trustee indicating that the $100,000.00 loan was for "entertainment purposes, material, supplies, labor, renovations of rental space and all other duties to maintain the property."[34]   Notwithstanding this response, the Defendants

---

[28] *Id.*  The Trustee is not seeking to recover $18,931.69 in payments made by the Debtors between June, 2013 and the Closing.  *See* Post-Trial Brief of Plaintiff Donald R. Lassman, Chapter 7 Trustee (the "Trustee's Brief"), Docket No. 75 at 13.

[29] Joint Pre-Trial Statement, Docket No. 46 at 4.

[30] Joint Pre-Trial Statement, Docket No. 46 at 6.

[31] Joint Pre-Trial Statement, Docket No. 46 at 4.

[32] *Id.*

[33] *Id.*; Ex. 5.

[34] Ex. 6.

stipulated in the Joint Pre-Trial Statement that the $100,000.00 was a component of the purchase price of the Property.[35]

On May 2, 2013, the SBA filed a proof of claim in the amount of $122,005.09 consisting of $119,976.56 in outstanding principal and $2,028.53 in interest (the "SBA Claim").[36]  On June 5, 2013, the SBA executed the Unconditional Assignment absolutely, unconditionally, and irrevocably assigning to the Trustee all rights, claims and causes of action it had against the Defendants arising from or relating to the SBA Claim against the Debtors' estate, expressly including the right to prosecute such claims in the Trustee's name.[37]  On September 16, 2013, the Trustee filed the present adversary proceeding, asserting the following counts: Count I – Avoidable Actual Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A); Count II - Avoidable Constructive Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B); Count III - Avoidable Actual Fraudulent Transfers under Mass. Gen. Laws Ch. 109A, §§ 5, 8-9 and 11 U.S.C. § 544(b)(1); Count IV - Avoidable Constructive Fraudulent Transfers under Mass. Gen. Laws Ch. 109A, §§ 5-6, 8-9 and 11 U.S.C. § 544(b)(1); Count V – Recoverable Avoided Transfers under 11 U.S.C. § 550 and Mass. Gen. Laws Ch. 109A, §§ 8-9; Count VI – Common Law Fraud; Count VII – Aiding and Abetting Fraud; Count VIII – Negligent Misrepresentation; Count IX – Unfair or Deceptive Acts or Practices in Violation of Mass. Gen. Laws ch. 93A, §§ 2, 11.

On June 12, 2014, the Trustee moved for summary judgment on all counts, which the Defendants opposed.  After hearing on July 23, 2014, I denied the Trustee's motion for summary judgment on the basis that genuine issues of material fact remained in dispute with respect to the

---

[35] Joint Pre-Trial Statement, Docket No. 46 at 3.

[36] Joint Pre-Trial Statement, Docket No. 46 at 6.

[37] Joint Pre-Trial Statement, Docket No. 46 at 6.; Ex. 16.

Defendants' intent.  The parties filed the Joint Pre-Trial Statement on September 8, 2014. After several continuances, I conducted a trial on the merits on May 18 and 19, 2015.  At its conclusion, I took the matter under advisement.

B. The Trial Record

The first witness to testify was the Trustee's accountant, Craig R. Jalbert ("Jalbert").  He has been a principal of the accounting firm Verdolino and Lowey since 1987, and has been involved in approximately 7,000 bankruptcy cases.[38]  Jalbert testified that he and his firm performed an investigative analysis of the Debtors' assets and liabilities and identified transfers totaling $57,700.00 made by the Debtors to the Defendants.[39]  He also performed a balance sheet analysis and determined that, by any reasonable valuation, the Debtors were insolvent by over $100,000.00 in November, 2008, and remained insolvent each month through the petition date.[40]

Next, Maria Gooch-Smith ("Smith"), the Executive Director of SEED, explained SEED's role as a Certified Development Corporation under the SBA loan program.[41]  She repeatedly testified that both SEED and the SBA relied on the documents provided to them, including the P&S and the HUD-1, to assess the Debtors' loan application.[42]  In particular, Smith stressed that SEED and the SBA place substantial weight on the integration clause of the P&S, the seller financing disclosure, and the signatures of both the buyers and the sellers to confirm that the terms of the transaction are exactly as represented.[43]  She stated that neither SEED nor the SBA

---

[38] Trans. May 18, 2015 at 14-15; 23:24-25.

[39] *Id.* at 16-18.

[40] *Id.* at 20:7-25; 21:1-25.

[41] *Id.* at 49-54.

[42] *Id.* at 55:17-57:16; 58:9-59:15; 62:14-63:1; 75:19-21; 78:5-13; 80:22-81:11; 84:20-85:1; 86:5-87:9.

[43] *Id.* at 58:9-61:4.

were aware of the Promissory Note, and testified unequivocally that had the true purchase price of $500,000.00 and the existence of the Promissory Note been disclosed, the Debtors' financing would not have been approved or funded.[44]

Smith cited three reasons why the Debtors' loan application would have been rejected had the true purchase price been disclosed.  First, she testified that even with a purchase price of $400,000.00, the numbers "just barely" supported the financing, and the additional $100,000.00 would have reduced their positive net worth to a negative net worth of $40,000.00 to $60,000.00 and unacceptably impaired the Debtors' ability to repay the loan.[45]  Second, the commercial real estate appraisal of $375,000.00 did not provide the 85% loan to value ratio needed to support a loan at $500,000.00.[46]  Third, the Promissory Note's terms were inconsistent with the SBA guidelines which require that any seller's financing be on the same terms as the SBA's note.[47]  In fact, Smith opined that the additional debt of the Promissory Note was a "major contributory factor, if not the sole factor" of the Debtors' business problems.[48]

In closing, Smith testified that the SBA was repaid only $25,000.00 on account of the loan.[49]  Mechanics' has since foreclosed upon the Property, leaving no proceeds for the SBA.[50]

---

[44] *Id.* at 62:23-63:1; 71:14-17; 71:23-72:4; 85:2-5; 89:3-89:21; 94:13-18.

[45] *Id.* at 65:17-25; 67:3-22; 68:1-23

[46] *Id.* at 56:2- 14; 66:10-11; 71:23-72:4; 78:14-79:2.

[47] *Id.* at 72:5-73:5; 74:5-8.

[48] *Id.* at 87:17-21.

[49] *Id.* at 91:8-12.

[50] *Id.* at 92:5-18.

She further explained that the SBA's loss on this loan exceeded the reserve funds, which means the loss may ultimately be passed onto the taxpayers.[51]

Both Defendants testified at trial. Robert's testimony was often evasive and inconsistent with stipulated facts and prior statements. I found his testimony incredible.

Robert explained that he purchased the real estate in 2003 after operating a sports bar on the premises since 2000.[52] When he purchased the bar, Robert was represented by Attorney Richard Scarano ("Scarano"), but he did not retain counsel when he purchased the real estate because the seller's attorney "did all the paperwork for the sale."[53] By mid-2005, Robert wished to get out of the bar business and began searching for a buyer.[54] After several deals fell through, he entered into negotiations with Stephen Toli.[55] By this time, the business had been closed for eight months and the "bills," meaning taxes and mortgage obligations, were "piling up."[56]

The Defendants wanted $550,000.00 in exchange for the Property, but the Debtors would not purchase at that amount.[57] Robert testified that they subsequently agreed upon a purchase price of $500,000.00.[58] While the purchase price is a stipulated fact, Robert then averred that the

---

[51] *Id.* at 95:1-15.

[52] Trans. May 19, 2015 at 63:9-15.

[53] *Id.* at 63:7-8; 16-23.

[54] *Id.* at 30-32.

[55] *Id.*

[56] *Id.* at 32:20-33:21.

[57] *Id.* at 5:12-14; 35:6-11

[58] *Id.* at 5:9-24.

purchase price was in fact $480,000.00 as a result of a $20,000.00 reduction he gave the Debtors for repairs.[59]

As previously indicated, the Defendants stipulated that they knew the Debtors required financing to complete the transaction.[60]  At trial, however, Robert initially denied having any knowledge of how the Debtors intended to obtain the funds necessary to buy the Property, but later acknowledged that he was "sure [Stephen Toli] was" seeking to borrow money from a mortgage lender, but immediately qualified his response with "[b]ut I'm not him."[61]  I pause to note that not only did Robert testify contrary to his admission, but the Debtors' need for financing was so central to the entire transaction and prompted the structure of the transaction that Robert's testimony on this point could only be untrue.

Similarly, Robert initially testified that he was unaware that lenders would not finance more than $400,000.00 for the purchase of the Property, then briefly agreed that the purpose of the Promissory Note was to make up the difference in the purchase price, before clarifying that he did not, in fact, know.[62]  At his deposition, a transcript of which was admitted into evidence, Robert testified that discussions regarding the Promissory Note arose when "[Stephen Toli] said he couldn't get what I wanted for the business. . . and it wasn't worth that.  So he came up with this plan."[63]  After this excerpt was read to him in Court, Robert said that "maybe" it refreshed his memory that the lenders would not fund the transaction in an amount more than

---

[59] *Id.* at 5:15-24.

[60] Joint Pre-Trial Statement, Docket No. 46 at 3.

[61] Trans. May 19, 2015 at 11:19-25; 19:8-18.

[62] *Id.* at 13:7-14:2.

[63] Ex. 17 at 30:4-9.

$400,000.00.[64]   When pressed further with additional excerpts from his deposition, Robert eventually conceded that the Promissory Note was executed to make up the difference between his asking price and what the lenders were willing to provide.[65]   Particularly where it is undisputed that the Defendants wanted cash, but instead accepted the Promissory Note because they did not want the deal to fall through,[66] Robert's equivocation on what is undoubtedly the most memorable aspect of this transaction further evidences his lack of credibility.

On February 23, 2006, the Defendants and Stephen Toli executed the P&S reflecting a purchase price of $400,000.00.[67]   Robert recognized that the $100,000.00 Promissory Note was part of the purchase price, but testified that he "just thought it was a private deal between me and Steve."[68]   He asserts that he did not understand the representations in the P&S to require the disclosure of the Promissory Note, and repeatedly urged that he did not know he was doing anything wrong by not doing so.[69]   Robert further testified that he thought the Promissory Note did not involve the lenders,[70] and did not know the P&S would be supplied to them,[71] which, again, is contrary to his admissions.[72]

---

[64] Trans. May 19, 2015 at 14:3-24.

[65] *Id.* at 15-16.

[66] *Id.* at 34:22-24; 35:12-19.

[67] Ex. 1.

[68] Trans. May 19, 2015 at 10:6-14; 22-24.

[69] *Id.* at 85:7-18.

[70] *Id.* at 77:4-6.

[71] *Id.* at 18:2-25.

[72] Joint Pre-Trial Statement, Docket No. 46 at 3.

At a later point in his testimony, Robert admitted that the Promissory Note should have been disclosed on the HUD-1, and, as a result of its absence, the purchase price was misrepresented thereon.[73]  He also agreed that he had an obligation to be truthful on both the P&S and the HUD-1,[74] and that the existence of the Promissory Note would have been a material consideration in deciding whether to lend to the Debtors.[75]  Nevertheless, Robert testified that he did not think he had any obligation to disclose the existence of the Promissory Note to the lenders because he was not the one seeking financing.[76]  Robert conceded, however, that he benefitted from the financing by receiving over $400,000.00, which yielded him a net surplus after he paid off his creditors.[77]

Notwithstanding the Defendants lack of disclosure, Robert testified that they did not conceal the Promissory Note from the lenders.  He stressed that he did not understand what a HUD-1 was at the time of the Closing,[78] had never sold a business before,[79] and only "look[ed] at the numbers real quick but . . . didn't look at the writing."[80]  Robert testified that he only scrutinized the amount he would receive, which is why he was able to identify a discrepancy in the purchase price in the approximate amount of $15,000.00.[81]

---

[73] Trans. May 19, 2015 at 41:1-16; 43:2-4.

[74] *Id.* at 20:1-25; 27:14-25; 28:1-10.

[75] *Id.* at 26:21-24.

[76] *Id.* at 25:6-18; 77:7-9.

[77] *Id.* at 30:12-18.

[78] *Id.* at 20:18-23.

[79] *Id.* at 56:6-18.

[80] *Id.* at 36:24-37:2.

[81] *Id.* at 37:1-17; 69:9-25.

Robert testified that the Closing took place at a Mechanics' branch office in Taunton, two miles from Dina's workplace.[82]  When asked why the parties did not execute the Promissory Note at the Closing while all the requisite parties were in the same room, Robert initially suggested it was because they needed an acknowledgment by a notary, but subsequently admitted that there was an attorney at the Closing notarizing all the loan documents in front of him.[83]  He then insisted that the parties left the Mechanics' branch in favor of Dina's workplace because it was "more convenient," but did not and was unable to explain why.[84]

Throughout Robert's testimony, he made references to having retained Scarano to represent him with respect to the sale transaction and relied on his advice in going forward with the transaction as structured.  It is undisputed that Scarano drafted the Promissory Note, and did so after Robert "told him what [they] we doing."[85]  Robert recalled that Scarano told him to have the Promissory Note notarized, but could not remember when he received the Promissory Note.[86]  Scarano is not listed on the P&S as the seller's attorney, and was not present at its execution, the Closing, or the signing of the Promissory Note.[87]  When Robert was asked if he read the P&S, he responded noncommittally that "I probably fudged over it, me and my attorney."[88]  Additionally, one of the many times he was asked why he did not disclose the Promissory Note, Robert

---

[82] *Id.* at 39:24-38:3; 87:7-11.

[83] *Id.* at 49:1-9.

[84] *Id.* at 76:8-14; 88:1-19

[85] *Id.* at 75:13-21.

[86] *Id.* at 46:12-17.

[87] *Id.* at 11:15-18; 40:3-6; 45:24-25; Ex. 1.

[88] Trans. May 19, 2015 at 8:8-14.

answered, "Well I don't know, Because my – maybe my attorney told – I don't know."[89]  When asked expressly whether Scarano reviewed the closing documents before the Closing, Robert indicated that "I think he did . . . I think we met at Dunkin' Donuts or something."[90]  He could not, however, recall when that meeting might have taken place.[91]  At his deposition, Robert testified that Scarano had not reviewed the closing documents because "he didn't have them."[92]  Robert's memory was not refreshed by this statement, and continued to insist that he thought Scarano reviewed some documents, whether the P&S or the closing documents.[93]  At the trial, Robert conceded that there was nothing in the record evidencing that Scarano actually represented the Defendants and advised them with respect to the sale.[94]

Unlike Robert, Dina credibly testified that she did not read any document that she signed and simply relied on her husband to explain the transaction.[95]  She avoided the specifics, but generally understood that the Debtors would finance $400,000.00 while the remaining $100,000.00 of the purchase price would be paid by the obligations under the Promissory Note.[96] Dina insisted that the $100,000.00 Promissory Note was "outside" the P&S, but could not articulate why.[97]  Like her husband, Dina maintained that they did not deliberately withhold the

---

[89] *Id.* at 24:15-21.

[90] *Id.* at 52:15-18.

[91] *Id.* at 52:19-25.

[92] *Id.* at 53:1-7.

[93] *Id.* at 53:9-25.

[94] *Id.* at 54:2-25.

[95] *Id.* at 91:5-24.

[96] *Id.* at 91:17-21; 94:11-17.

[97] *Id.* at 96-99.

Promissory Note from the lenders,[98] but could not explain why the Promissory Note was executed at a different location from the Closing when all the parties were already together at the Mechanics' branch with a notary.[99] Finally, while she initially testified that Scarano told her that he reviewed the closing documents and that everything would be fine, she later conceded that she never had any conversations with Scarano.[100]

The Defendants called the Trustee as a witness and questioned him about his investigation into the sale transaction, specifically probing what he knew and what steps he took prior to filing the Complaint. Ultimately, this testimony did not yield relevant facts.

## III. __DISCUSSION__

### A. Avoidance and Recovery of Fraudulent Transfers

Section 548(a)(1) of the Bankruptcy Code provides:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

---

[98] *Id.* at 109:10-19.

[99] *Id.* at 106-107.

[100] *Id.* at 123:21-25; 130:15-18.

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[101]

Similarly, under Mass. Gen. Laws ch. 109A, § 5,

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.[102]

Additionally, Mass. Gen. Laws ch. 109A § 6 provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[103]

Pursuant to 11 U.S.C. § 550, the Trustee may recover property transferred or its value from the transferee of an avoidable transfer.[104]

---

[101] 11 U.S.C. § 548(a)(1).

[102] Mass. Gen. Laws ch. 109A, § 5.

[103] Mass. Gen. Laws ch. 109A, § 6.

[104] 11 U.S.C. § 550(a).

Each of these statutes require that the alleged fraudulent transfer to be made without the Debtors having received "reasonably equivalent value." Thus, the Trustee's theory is premised on the notion that the sale price was $400,000.00 and the Debtors did not receive any consideration for the $100,000.00 Promissory Note. This argument, however, is foreclosed by the agreed facts. The parties expressly stipulated that the purchase price was $500,000.00 and that the Promissory Note was always intended to be part of the sale.[105] For this reason, I find that the Trustee has not sustained his burden and the Defendants are entitled to judgment on Counts I through V.

### B. Common Law Fraud and Aiding and Abetting Fraud

Under Massachusetts law, to recover for fraud a plaintiff "must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage."[106] To recover on the theory that a defendant aided and abetted a tort, the plaintiff must show that: (1) a third party "committed the relevant tort;" (2) the defendant "knew [the third party] was committing the tort;" and (3) the defendant "actively participated in or substantially assisted in his commission of the tort."[107]

It is undisputed that the purchase price reflected on the P&S and HUD-1 was inaccurate. Moreover, despite express language in the P&S calling for the disclosure of any seller's note,

---

[105] Joint Pre-Trial Statement, Docket No. 46 at 3.

[106] *Kilroy v. Barron*, 326 Mass. 464, 465 (1950). See *Masingill v. EMC Corp.*, 449 Mass. 532, 540 (2007); *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8 (1982).

[107] *Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 463 Mass. 50, 64 (2012).

neither the Debtors nor the Defendants disclosed the existence of the Promissory Note to the Debtor's lenders.  Thus, the record establishes the existence of a false representation.

The false representations were material.  Smith testified unequivocally that had SEED or the SBA known about the Promissory Note, the Debtors' financing would not have been approved or funded.  In support, she credibly explained that even at a purchase price of $400,000.00, the numbers "just barely" supported the financing, and that the addition of $100,000.00 more of indebtedness exceeded the loan to value ratio and unacceptably impaired the Debtors' ability to repay the loan.  Smith also testified that a seller's note, such as the Promissory Note, with more favorable repayment terms that would ensure the seller was repaid before the lenders violated the SBA guidelines.  At trial, Robert conceded that the existence of the Promissory Note would have been a material consideration from a lender's perspective.

At trial, Smith further testified that SEED and the SBA relied on the documentation supplied, including the P&S and the HUD-1, to assess the Debtors' application.  She stressed that substantial weight is placed on the integration clause of the P&S, the seller financing disclosure, and the signatures of both the buyers and the sellers to confirm that the terms of the transaction are exactly as represented.  Therefore, I find that in approving and funding the loan, SEED and the SBA actually and reasonably relied on the false representations contained in the P&S and HUD-1.

Without question, the SBA was damaged by the false representations.  SEED loaned $147,000.00, which was guaranteed by the SBA, to the Debtors that was disbursed to the Defendants at the Closing.  At trial, Jalbert testified that, by any reasonable valuation, the Debtors were insolvent by over $100,000.00 in November, 2008, and remained insolvent each month through the petition date.  Notwithstanding this insolvency, the Debtors continued to

make payments on the Promissory Note through May, 2012.  Moreover, as a result of the

Promissory Note's shorter term, the Defendants received Transfers totaling $57,700.00 on

account of the Promissory Note, while the SBA has only received $25,000.00 on account of the

loan.  The Property has been foreclosed by Mechanics', leaving the SBA with a deficiency claim

of approximately $120,000.00.  Smith credibly testified that this loss exceeded the reserve funds,

meaning that the SBA's loss will likely be passed on to the taxpayers.

The next questions are whether the Debtors and Defendants knew the representations

they made were false and made the representation for the purpose of inducing the lenders to act.

Because the Debtors did not testify, and the record only shows that Cindy Toli signed loan

documents and not the P&S, I cannot find what she knew or intended.  Stephen Toli, on the other

hand, was intimately involved in both the negotiation of the sale and the acquisition of financing.

Therefore, I find that he knew that the information supplied on the loan documentation and P&S,

particularly the purchase price and absence of seller financing, was false.   Given the

circumstances, I may also infer that he made those knowingly false representations for the

purpose of obtaining financing from SEED and the SBA.

As stated above, Dina credibly testified that she relied on Robert's representations about

the transaction and merely signed each document placed in front of her without reading it.

Although she was fully aware that the true purchase price was $500,000.00, I find that she did

not know, either at the execution of the P&S or the Closing, that the documents reflected

something different.  For this reason, I find that the Trustee has not sustained his burden of

proving that Dina engaged in fraud or knowingly aided and abetted the fraud of others.

Robert was fully aware of all the circumstances surrounding the purchase and sale of the

Property.  He knew the purchase price reflected on the P&S and HUD-1 were inaccurate.  Even

20

without having read the documents thoroughly, the structure of the transaction establishes that he knew and intended that the purchase price would include undisclosed seller financing.

Despite his incredible protestations to the contrary, Robert stipulated that he knew: (1) that the Debtors were seeking to borrow money from the mortgage lenders to fund the sale; (2) that without financing, the Debtors could not close; (3) that the Debtors would provide the P&S to the mortgage lenders in order to approve the financing; and (4) that the lenders would rely on the truthfulness and completeness of the terms set forth in the P&S and HUD-1, including the purchase price and amounts of any other outstanding loans, in grating that approval.[108]  At trial, he even conceded that the existence of the Promissory Note would have been a material consideration from a lender's perspective in deciding whether to approve the loan.

Based on the circumstances surrounding the sale of the Property, I find that Robert and Stephen Toli knowingly concealed the existence of the Promissory Note from the lenders.  After Stephen Toli informed Robert that the lenders would not finance a purchase price of $500,000.00, they resolved to get around this issue by having Robert finance the remainder of his asking price through the Promissory Note.  Based upon Defendants' stipulated preference to have obtained cash from the Debtors, and Robert's testimony that the Promissory Note was intended to "make up the difference," it is clear Robert knew that the lenders would not finance a purchase price of $500,000.00.

Robert's testimony that he did not believe he was doing anything wrong or was otherwise relying on the advice of counsel is incredible.  Aside from drafting the Promissory Note, there is no evidence that Scarano was involved in any other aspect of the sale.  Indeed, Robert's testimony that he thought he met with Scarano to review the P&S and closing documents was

---

[108] Joint Pre-Trial Statement, Docket No. 46 at 3.

infirm and incredible.  Therefore, I find that Scarano only drafted the Promissory Note and did not otherwise advise Robert with respect to the appropriateness of their lack of disclosure on the P&S and HUD-1.

Scarano's role in drafting the Promissory Note, which does not reference the sale or specifically state the consideration given, is also telling.  When Robert testified that when he purchased the Property in 2003, he did not retain an attorney because the seller's attorney did all the paperwork.  Here, the Debtors' counsel drafted the P&S, but Robert directed Scarano draft the Promissory Note.  Given that Scarano is not identified in the P&S as the seller's counsel, and the existence of the Promissory Note is not disclosed, suggest that Robert, and likely Stephen Toli, may have been seeking to conceal the Promissory Note from the Debtors' counsel as well.

Moreover, Robert's explanation of why the Promissory Note was executed at Dina's workplace instead of the Mechanics' branch is incredible.  He insisted that the reason was that the workplace was a more convenient location, but this is implausible.  At the Closing, they had the Promissory Note in the possession, or at least in the car, and all the parties were present with a notary.  Instead of signing the Promissory Note at the Closing in front of the lenders and their attorney, the parties instead immediately drove two miles away to complete that transaction. Therefore, I find that this arrangement was intended to prevent the lenders from learning of the Promissory Note and ensure the Debtors' financing went forward.

For all these reasons, I find that Robert made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the lenders to fund the Debtors' loan. Moreover, I find that Robert was aware of Stephen Toli's fraud upon his lenders, and actively supported him in keeping their fraud secret.  Accordingly, the Trustee is entitled to judgment against Robert on Counts VI and VII.

C. Negligent Misrepresentation

"To prove the tort of negligent misrepresentation, a plaintiff must establish that the defendant, (1) in the course of her business, or in a transaction in which she had a pecuniary interest, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that she (6) failed to exercise reasonable care or competence in obtaining or communicating the information."[109]    In the discussion of fraud set forth above, I have already found that false representations of a material fact were supplied to the lenders on which they reasonably relied to their detriment.    Moreover, based on my finding that Robert's misrepresentations were intentional, Robert is entitled to judgment on Count VIII.

While I previously found that Dina did not intentionally misrepresent the purchase price on the P&S and HUD-1, her failure to read those documents establish that her representations, as evidenced by her signature, were recklessly made.    At trial, she testified that she was aware that the purchase price was $500,000.00.    Therefore, if she had read the documents she signed, including the HUD-1 that she signed under the penalty of perjury, she would have been aware that the purchase price as represented to the lenders was only $400,000.00.    Therefore, I find that the Trustee is entitled to judgment against Dina on Count VIII.

D. Chapter 93A

Pursuant to Mass. Gen. Laws ch. 93A § 2, "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.    "[A] chapter 93A claimant must show that the defendant's actions fell within at least the penumbra of some common-law, statutory, or other established concept of unfairness, or were immoral, unethical, oppressive or unscrupulous, and

---

[109] *DeWolfe v. Hingham Ctr., Ltd.*, 464 Mass. 795, 799-800 (2013).

resulted in substantial injury ... to competitors or other business [persons]."[110]   Under Chapter

93A, however, a plaintiff cannot file suit under that statute until 30 days have elapsed after a

demand letter of the type set forth in Mass. Gen. Laws ch. 93A, § 9(3) has been sent.[111]   In the

present case, the Trustee sent a demand letter, but the letter did not make any reference to

Chapter 93A or "its vocabulary,—unfair or deceptive, multiple damages, recovery of legal

fees."[112]   Therefore, the Defendants are entitled to judgment on Count IX.

## IV. **CONCLUSION**

In light of the foregoing, I will enter an order granting judgment for the Trustee against

Robert on Counts VI and VII and against Dina on Count VII, and award damages in the amount

$122,005.09, constituting the amount of the SBA's unpaid deficiency.   Judgment will enter in

favor of the Defendants on Counts I through IV, and IX.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: August 14, 2015


Counsel Appearing:

      Timothy J. Durken, Steven C. Reingold, Jager Smith P.C., Boston, MA,
         for the Trustee
      Christopher J. Fein, Fein Law Office, P.C., Braintree, MA,
         for the Robinsons

---

[110] *Boyle v. Int'l Truck And Engine Corp.*, 369 F.3d 9, 15 (1st Cir. 2004) (internal quotations omitted.).

[111] Mass. Gen. Laws ch. 93A, § 9(3).

[112] *See Cassano v. Gogos*, 20 Mass. App. Ct. 348, 351 (1985).